**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 1:24-cr-00247-NYW-2

UNITED STATES OF AMERICA,

Plaintiff,

v.

2. **JESUS DANIEL LARA DEL TORO**

Defendants

---

**JESUS DANIEL LARA DEL TORO'S SENTENCING STATEMENT AND MOTION FOR VARIANT SENTENCE**

---

Jesus Daniel Lara Del Toro, through his attorney, Benjamin LaBranche, is requesting the court impose a variant sentence of 84 months for Count 1 and 84 months for count 2 to run consecutive for a total of 168 months.[1] Pursuant to 18 U.S.C. 3553(a), and considering Mr. Del Toro's history, character, and circumstances, such a sentence is sufficient but not greater than necessary in this case. Mr. Del Toro offers the following in support of this motion.

## I. Legal Standard

The Court's sentencing decision in Mr. Del Toro's case is guided and governed by 18 U.S.C. § 3553(a), which directs that the Court should impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of that subsection. In making its determination, the Court is specifically directed to consider both the nature and

---

[1] Count 2 is for a violation of 18 U.S.C. § 924(c) and requires that an 84-month mandatory minimum sentence run consecutive to the underlying offense.

circumstances of the offense and the history and characteristics of the defendant, among other factors.

The sentencing guidelines promulgated by the United States Sentencing Commission are advisory. Rather than focusing solely on the calculated guideline range, courts must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 128 S.Ct. 586, 596 (2007). The sentencing court should consider arguments that the guidelines should not apply on general policy grounds, case specific grounds, or any other factor that might render a particular sentence "reasonable". *Gall*, 128 S.Ct. at 596-97. In short, the court must "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall*, 128 S.Ct. at 598.

## II. Nature and Circumstances of the Offense

Mr. Del Toro was charged with and pled guilty to the following offenses:

> **Count 1:** Hobbs Act Robbery and Aiding and Abetting the Same, in violation of 18 U.S.C. §§ 1951(a) and 2; and
>
> **Count 2:** Possession of a Firearm in Furtherance of a Crime of Violence and Aiding and Abetting the Same, in violation of 18 U.S.C. § 924(c) and 2.

On June 24, 2024, Mr. Del Toro was provided with drugs and a gun and went with several other individuals to rob Joyeria el Ruby which is a jewelry store in Denver. He told the others that he did not want to have a gun during the robbery. However, he was told that everyone would carry a gun or they would not be allowed to participate. He was also told that no one would be injured, so he agreed to the plan. One of his co-defendants entered the store first and was pretending to be a customer. Mr. Del Toro and two other co-defendants then entered the

store. When they were buzzed in from the entrance's security cage to the showroom floor, they drew their firearms and ordered everyone to the ground.

Two female employees attempted to escape to the back of the store, but they were apprehended by two other co-defendants. Those co-defendants followed the employees to the back room and ordered them to remain on the ground. Both employees were struck in the head multiple times with those co-defendants' guns. The employees were injured and received stitches for small lacerations to their scalps. Mr. Del Toro did not see that incident and did not realize what had happened until he saw blood on the floor when leaving the store. One of the main reasons he agreed to the robbery was because he was assured no one would be hurt. While Mr. Del Toro did hold several individuals at gun point, he did not strike anyone.

Another co-defendant on the other side of the store ordered several customers to the floor. He also ordered a salesclerk to cross the counter to join those individuals on the ground. Mr. Del Toro then held all the individuals in the front of the store at gun point while his other co-defendants snatched multiple pieces of jewelry that were displayed on the wall and display counter. Mr. Del Toro eventually left the individuals on the floor and started snatching jewelry that was displayed on the walls.

In less than 5 minutes, Mr. Del Toro and the other robbers fled in two different vehicles and a motorcycle. While the robbers were not in the store for very long, it was a very traumatic event for all employees and customers that were present. A substantial amount of jewelry was also taken. The victims had an insurance policy that covered losses due to theft; however, the policy limits were $2,000,000. The victims submitted a claim estimating their loss was closer to $4,000,000. The insurance company did an investigation and estimated the amount of loss was greater than $2,000,000, so they tendered the entire policy limits minus the $5,000 deductible.

While Mr. Del Toro agrees that the financial loss was massive, the insurance company stopped trying to calculate the loss after they estimated it was over $2,000,000. Probation has calculated the loss to be more than $3,000,000. However, Mr. Del Toro has objected to that amount because it is unclear how it was calculated.

After the robbery, the jewelry was given to another individual or individuals that were going to fence it for the group. Mr. Del Toro and several other co-defendants spent the night after the robbery in Colorado Spring before traveling to El Paso, Texas the next day. Mr. Del Toro did not have anything to do with the planning of the robbery or the arrangements to sell the jewelry. He was promised that he would receive payment when he returned to Columbia. After that, his plan was to return to his family in Venezuela. Arrangements were allegedly made for he and his co-defendants to sneak across the Mexican Border and ride the Beast Train to Central America and travel from there to Columbia. Many immigrants from central and south America make the journey to the United States by stowing away on the Beast Train. It is an extremely dangerous method of travel where many die from falling off. Many immigrants are also robbed, raped, and killed by others on the train. It was the same route that he had taken to immigrate to the United States, so he knew how dangerous it would be.

Mr. Del Toro and several other co-defendants were staying in a motel in El Paso, Texas with the intent to eventually cross the border into Mexico. Police had also received information that robbery suspects from Colorado were staying at that hotel. After conducting surveillance, police were able to positively identify many of the robbery suspects from pictures circulated from the robbery. They obtained a warrant to search the room, and when the warrant was executed, they found multiple items of jewelry from Joyeria el Ruby and several firearms. Police only found approximately $8,000 worth of jewelry since the bulk of what was taken had

already been passed on to the fence. Everyone in the hotel room was arrested. Mr. Del Toro did not make any statements to the police.

**III. History and Characteristics of the Defendant**

Mr. Del Toro was born and raised in Venezuela. When he was 6 years old, his family lost their home in a flood and spent almost two years in a government camp for flood victims. After that they were provided with government housing in a high-rise apartment building. When he was 13 years old, left school and began operating a small fruit stand. He also had second job working on a cacao farm. While he wanted to stay in school, he thought it would be better for his family if he started to work. School books, uniforms, and lunches would cost his family money, and there was no guarantee that he would receive a better job after receiving an education. His family needed more income to help pay bills and obtain food. Therefore, he started working and gave most of his earnings to his mother to help her take care of him and other family members.

Growing up in Venezuela was very difficult. His family was extremely poor and they were surrounded by crime, violence, and corrupt police. When Mr. Del Toro was 13 years old his older brother was murdered by the police. He witnessed masked police officers chase his brother down and shoot him which was extremely traumatic for him. Mr. Del Toro believes that police murdered multiple individuals in his neighborhood who were associated with a criminal the police were targeting. Police looked at that individual's social medial post, and several individuals who in pictures with that person were ultimately killed by police.

When Mr. Del Toro was 16 years old, he was also falsely arrested and beaten by police in Venezuela when he was a teenager. At first they believed he may have had information on suspects they were looking for. However, when they discovered he had no information, they

filed bogus drug charges against him, but he had never even smoked marijuana at that age. The police were also trying to extort money from his family in exchange for his release, but they could not afford to pay any ransom. He remained in a Venezuelan jail for approximately 7 months before the case was ultimately dismissed. His family feared that the police would retaliate against him after his release, so they eventually helped him move to Columbia for his safety. He worked in Columbia at a butcher shop, but it paid even less than his fruit stand did.

Realizing his situation in Columbia was not going to work, Mr. Del Toro and his family eventually saved up enough money for him to come to the United States. The journey took about three months. He walked for several days though the Darien Gap, rode various buses, and rode the Beast Train through Mexico. He eventually made it to Juarez, Mexico and was apprehended attempting to cross the U.S. Border near there. Mr. Del Toro provided a mitigation report to Probation which outlines in greater detail his family history, and his life in Venezuela before immigrating to the United States. Probation has agreed to attach a copy of that mitigation report to Mr. Del Toro's PSR. Therefore, this memorandum will focus more on his life in the United States.

Mr. Del Toro spent about 4 days in immigration custody when he was apprehended at the border. After that, he and other immigrants in that facility were released and provided a hotel room in Texas. After approximately two weeks in that hotel, he was offered the option to relocate to several other U.S. cities. His original plan was to go to New York because his mother had a friend that lived there and agreed to take him in. However, after arriving in Texas, he called his mom's friend who told him he had no room since he was already housing several other immigrants from Venezuela. Someone he crossed the border with suggested they both go to Denver because there were jobs in Colorado. Since he had no other options, he agreed to accept

a bus ticket to Denver. When he arrived in Denver, he was provided with another hotel room for approximately one month. He reached out to his mother's friend to see if he could live with her in Denver. However, she was already assisting several other immigrants with housing, so she had no room for him. He began going to Home Depot stores in the area to search for work as a day laborer, and he was able to find jobs working for different roofers.

He eventually met a woman at Home Depot who asked if he wanted to come stay with her and her family. He accepted her offer for a place to live and continued to do day labor. She did not charge him rent, but he did help around the house with chores and with her children. However, she was moving to California, and her lease in Colorado was about to expire. She made an offer for him to move with her, but he did not want to impose on her family. He decided to stay in Colorado and look for another place to live.

Mr. Del Toro eventually contacted a Venezuelan he had met in Columbia to see if he could provide him with a place to stay, and he agreed to accept him. However, it was not a normal living situation. There were multiple other individuals staying there and drugs were always present. Mr. Del Toro was thankful he had a place to stay, and his plan was to pursue work. However, his friend did not charge him rent or for food. He was also provided with free Tusi during his time there. The residence was basically a flop house for multiple other Venezuelan immigrants, and most were heavy drug users.

Mr. Del Toro had used drugs before in Columbia, but it was mostly experimental use on random weekends. However, he quickly started using everyday. Since he was allowed to live there rent free and was provided food, he did not pursue gainful employment. After several weeks, he became exhausted from lack of sleep and constant drug use. He wanted to move out, but he had no other place to go.

Then Mr. Toro was recruited to participate in a robbery. It was planned by other co-defendants and other unindicted co-conspirators. He would not have normally accepted an invitation to participate in such a crime; however, he was not thinking clearly due to his daily drug usage. He also agreed because he was having a difficult time being separated from his family and thought the proceeds from the robbery would allow him to return home and provide financial support to them. He was also guaranteed they would all make money, and he would be able to collect his portion once he returned to South America. However, he now suspects that he would have been killed or robbed had he ever attempted to collect anything from the robbery.

The most difficult aspect of Mr. Del Toro's incarceration has been that he has very little contact with his family. As a new inmate, he had no money in his inmate account and had to wait about two months to call his mother. He was eventually able to secure work as an orderly in the jail. His job barely provides enough money for him to purchase necessities and make international calls to his mother. It only pays him $15.00 per month, and he is charged $4.00 for every 15-minute call to Venezuela. However, he is extremely grateful to have that job because without it he would be even more isolated from his family.

Venezuela was also recently struck by two separate 7.2 and 7.5 magnitude earthquakes. As of July 6, the death toll was estimated to more than 3,340 people, with over 16,740 injured and around 17,000 left homeless.[2] Mr. Del Toro had to wait about two weeks to even attempt to call his mother because he had no money in his account at the time of the earthquakes. He eventually reached her and received news that most of his family was ok. However, one of his cousins had died in the earthquake. She had a newborn child that she had to throw out the window of her crumbling apartment building. People on the street caught the baby and it

---

[2] https://news.un.org/en/story/2026/07/1167879 (visited 7/13/26)

survived. However, his cousin could not escape the building before it eventually collapsed. She was buried in the debris, and her body was found several days later. His mother was also displaced from her apartment building for about two weeks, but the government allowed everyone to move back in after it was inspected. Several other family members, including his grandfather, have been displaced and still have no place to live.

**IV. Reflect the Seriousness of the Offense and Provide Just Punishment**

A variant sentence of 168 months will still reflect the seriousness of the offense and provide just punishment in this case. Mr. Del Toro was only 20 years old at the time he participated in this crime, and this is his first and only arrest in the United States. He reviewed the victim impact letters attached to his PSR and feels extremely remorseful for his victims. Mr. Del Toro is deeply ashamed for having participated in this crime and the trauma he has caused to all the victims. A sentence of 168 months is equal to 14 years, which is an extremely long sentence for someone who is now only 22 years old.

Mr. Del Toro's guidelines call for an 87-107 month sentence for the robbery, and an 84-month sentence for the 924 (c) count, which must run consecutive to the robbery count. While he is asking for a variance in his case, it is only 3 months below the bottom of his guideline range. Sentencing data for other robbery cases also supports that this is a just sentence in this case.

The United States Sentencing Commission drafted a report titled *Federal Robbery: Prevalence, Trends, and Factors in Sentencing (2022)*[3] (USSG Robbery Report) which provides a comprehensive study of robbery offenders using federal sentencing data. Some of the USSG Robbery Report's Key findings were:

---

[3] https://www.ussc.gov/research/research-reports/federal-robbery-prevalence-trends-and-factors-sentencing

- Only one-quarter (26.5%) of robbery offenders were in the least serious criminal history category, CHC I, compared to 40.7 percent of other violent offenders.
- Over three-quarters (77.6%) of robberies involved dangerous weapons. Firearms were the predominant type of weapon—they were present in 79.8 percent of robberies involving weapons.
- The overwhelming majority (89.7%) of robberies involved a threat of physical force against a victim, and over one quarter (25.7%) involved the use of physical force against a victim. A victim sustained bodily injury in 11.8 percent of robberies.
- A substantial proportion (40.6%) of robbery offenders sentenced in fiscal year 2021 also had a conviction under section 924(c) for using or carrying a firearm during the offense.
- Section 924(c) convictions also impacted the anchoring of sentences to the robbery guideline. The average sentence for robbery offenders convicted under section 924(c) was 28 months less than the average guideline minimum, compared to ten months for robbery offenders without a section 924(c) conviction.
- The average sentence imposed for robbery offenders also convicted under section 924(c) was 155 months of imprisonment, compared to an average sentence of 71 months for robbery offenders without a section 924(c) conviction.

When applying the key findings from the USSG Robbery Report to Mr. Del Toro's case, we can see how it compares to other robberies with a 924(c) count. He has no prior criminal history, which is unusual for a robbery defendant. The robbery he participated in was not very different from most other robberies since most involve firearms and the threat of physical force against a victim. However, the use of force by his other co-defendants does make this more serious than other robberies. While only 11.8 percent of robberies result in bodily injury, Mr.

Del Toro was not directly involved in causing injury to any of the victims. However, the requested sentence of 168 months is actually above the average sentence of 155 months that is usually imposed in 924(c) robbery cases and most robbery offenders have prior criminal histories. He has no prior criminal history or pending charges. Therefore, the sentencing commission's own data supports that a variant sentence of 168 months would still reflect the seriousness of the offense and provide just punishment for this defendant.

**V. Provide Adequate Deterrence and Protect the Public**

A sentence of 168 months under the circumstances is more than adequate to deter similar conduct. Mr. Del Toro was only 20 years old at the time he committed this offense, and this is his first conviction. He participated in the robbery out of an act of desperation and during the height of his drug usage. Prior to committing this crime, he had never been involved in any acts of violence. While two victims were injured in the robbery in, he had no direct involvement in causing their injuries. He has no documented history of violence prior to this robbery, and unlike some of his other co-defendants, this is the only robbery he has participated in. Therefore, a sentence of 168 months accomplishes the sentencing goals of deterring others from committing such crimes while also protecting the public.

**VI. The Need to Avoid Unwarranted Sentence Disparities**

Section 3553(a)(6) directs the Court to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. There have only been two other defendants who have been sentenced at this time. Newman Castillo-Delgado received 156 months for the robbery and 84 months for the 924 (c) count to run consecutively for a total sentence of 240 months. However, Mr. Castillo-Delgado

was responsible for organizing the robbery and recruiting others to participate in it. He was also directly involved in injuring both victims, while Mr. Del Toro was not.

At Mr. Castillo-Delgado's sentencing, the government stated, "the defendant basically then took the level of violence that had already been on display and had already been used and amplified it tremendously." (ECF 197 Sentencing Transcript p. 23) Mr. Castillo-Delgado had also been involved in at least two prior criminal acts prior to this arrest. At his sentencing, the Court noted one was a prior robbery where "a struggle ensued, and the defendant reached over the counter and pulled a necklace out of an open display case" and the other involved "allegations of breaking into a department store, with sledgehammers into the jewelry cases, and stealing merchandise of approximately $162,000. (ECF 197 Sentencing Transcript p. 39)

Jean Torres-Roman was also previously sentenced to 151 months for the robbery and 84 months for the 924 (c) count to run consecutively for a total of 235 months. However, Mr. Torres-Roman's conduct in this case and outside of it was much worse than Mr. Del Toro's. Mr. Torres-Roman received a 2 Level enhancement for obstruction of justice for an attempted escape from jail, which occurred after his arrest for this case. (ECF 232 Sentencing Transcript p. 32-33) Not only did his escape attempt cause significant damage to his cell, but it also prevented him from obtaining a 3-point sentencing reduction for acceptance of responsibility (ECF 232 Sentencing Transcript p. 33-34) Therefore, his guidelines were at least 5 points higher than Mr. Del Toro's.

At the time of his sentencing Mr. Torres-Roman also had other pending charges. The month before the robbery he was arrested in Cook County, Illinois for aggravated unlawful possession of a weapon and possession of a firearm or ammunition without an identification card. It appears that incident was another robbery or attempted robbery where he and two other

individuals used firearms to demand $500 in rent from another individual, and one of the victims was shot in the leg. (ECF 232 Sentencing Transcript p. 79)

Mr. Del Toro should receive a significantly lower sentence than Mr. Castillo-Delgado and Mr. Torres-Roman because he is not even suspected of being involved in any other criminal conduct other than this robbery and his drug use which contributed to him participating in it. In fact, had he not become involved with those individuals it is unlikely that he would have ever committed a robbery in the United States. To give Mr. Del Toro a similar sentence to those two co-defendants would create an unwarranted sentencing disparity because his history and characteristics are much more mitigating than they are for those individuals.

**VII. Conclusion**

Mr. Del Toro was only 20 years old when he committed this robbery. It is the only crime he committed in the United States or anywhere else. He was extremely desperate, impressionable, and vulnerable at the time he was recruited for this robbery. Had he been surrounded by positive influences instead of his co-defendants, he would not have participated in this robbery. He is deeply remorseful for his actions and intends on offering an apology to all his victims at sentencing. The 168-month sentence he has requested is extremely lengthy for someone his age with no prior criminal history. Therefore, a variant sentence of 168 months is sufficient but not greater than necessary to achieve the goals of 18 U.S.C. § 3553.

*Dated: July 15, 2026*

Respectfully Submitted:

*/s/Benjamin R. LaBranche*

Benjamin R. LaBranche
1544 Race St.
Denver, CO 80206
Phone: 225-927-5495
ben@brllawyer.com

**Certificate of Service**

I certify that on July 15, 2026, I electronically filed the foregoing Notice of Appearance of Counsel with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

*/s/Benjamin R. LaBranche*
Benjamin R. LaBranche